**FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, Plaintiff**

v.

**Luis MARTINEZ ALMODOVAR, et al, Defendants**

Civ. Nos. 80–1551(PG), 81–1322(PG).

United States District Court,
D. Puerto Rico.

Aug. 24, 1987.

Roberto J. Matos, Hato Rey, P.R., for defendants.

## OPINION AND ORDER

PEREZ–GIMENEZ, Chief Judge.

The present action was brought by the Federal Deposit Insurance Corporation in its corporate capacity ("FDIC") seeking to collect certain assets acquired from the receiver of a closed bank. This opinion and order comes at the tail end of an actively litigated dispute that culminated in a seven-day trial.[1]

The consolidated actions now pending before the Court commenced on July 3, 1980, with the filing by the FDIC of the complaint in case number 80–1551 seeking judgment against Luis Martínez Almodóvar ("Martínez") and his former wife, Isabel Amieiro Ortiz ("Amieiro"), for amounts due and owing on certain notes executed and delivered by Martínez to the former Banco Crédito y Ahorro Ponceño ("the Bank"). Martínez failed to respond to the complaint and partial judgment in default against him was entered on November 17, 1980, in the amount of $350,000.00, plus accrued interest.

On July 17, 1981, the FDIC filed a separate action bearing number 81–1322 against Martínez and Amieiro naming also as defendants the daughter of the latter two, Vilma Martínez Amieiro, her husband, Jorge Sesto, and Inversiones Vilmasor, Inc. ("Vilmasor"), alleging that it had not been able to collect the judgment against Martínez in case number 80–1551 due to certain alleged wrongful acts of the defendants involving the transfer of properties for the purpose of hindering, delaying and defrauding the creditors of Martínez. The complaint was subsequently amended on two occasions to include additional defendants. The defendants so joined were Lumaral Corp. ("Lumaral")[2] and the minor

Stanley Feldstein, San Juan, P.R. Frank L. Skillern, Jr., Gen. Counsel, FDIC, Washington, D.C., for plaintiff.

1. A bench trial was held on October 31, November 1, 2, 3, 4, 7 and 8, 1983, at which numerous documentary evidence and oral testimony was presented by each party.

2. After the trial Vilmasor and Lumaral filed separate petitions under Chapter 11 of the Bankruptcy Code. On August 2, 1984, the United States Bankruptcy Court for the District of Puerto Rico entered an order in cases Nos. B–84–

children of Vilma Martínez Amieiro and Jorge Sesto named Vilma and Soraya Sesto Martínez.

The second amended complaint, succinctly stated, alleged that as part of a scheme or plan to defeat, hinder or delay the creditors of Martínez, (1) in 1976 while married to one another and while indebted to the Bank, Martínez and Amieiro had transferred all their rights, title and interest in certain parcels of real property to Vilmasor; (2) Vilmasor had subsequently transferred some of said properties to others; (3) the transfer by Vilmasor had been effected for considerations less than the true values of the properties; (4) in furtherance of the same plan, the defendants had caused Lumaral to acquire certain promissory notes, the transfer of which notes was a sham; (5) Vilmasor and Lumaral were operating as the alter ego of the defendants; and (6) as a result of the acts of the defendants, the FDIC had been unable to collect the judgment against Martínez entered in case number 80–1551.

In their answer to the second amended complant, defendants denied all liability and raised the following affirmative defenses: the second amended complaint "fails to state facts upon which a relief could be granted for plaintiff", the FDIC lacks standing to bring this action, the action is time barred, the Bank "waived the present cause of action" and the Bank had charged an usurious commission and breached the Truth-in-Lending Act, the loan on which claim is made was paid thus releasing Amieiro from all liability, and the original obligation was the subject of novation.

Upon timely motion by the FDIC, both cases were subsequently consolidated.[3]

00116(B) and B–84–00117(B) modifying the stay under 11 U.S.C. § 362 to permit continuation of the present action until entry of final judgment.

3. On May 29, 1981, the FDIC filed case number 81–0936 against Martínez, Silverview Investment, Inc., Karelia Beito–Geli and Armando Brito. The complaint adduced grounds similar to those averred in case number 81–1322 and was originally consolidated with the present action.

*Findings of Fact*

1. Luis Martínez Almodóvar and Isabel Amieiro Ortriz were married to each other in Puerto Rico on June 26, 1938. They remained married until January 19, 1977, when they were divorced by judgment entered by the Superior Court of Puerto Rico, San Juan Part. (Admitted fact number 1; Exhibit C).[4]

2. Vilma Martínez Amieiro ("Vilma") is the only child of Martínez and Amieiro and is married to defendant Jorge Sesto ("Sesto"). (Ad. 3–4).

3. Vilma Sesto Martínez and Soraya Sesto Martínez are the minor children of Vilma and Sesto. (Ad. 5).

4. The FDIC is a corporation organized under the laws of the United States of America, to wit: 12 U.S.C. § 1811, and brought the present action in its corporate capacity. (Ad. 6).

5. Banco Crédito y Ahorro Ponceño ("the Bank") was a banking institution organized and existing under the laws of the Commonwealth of Puerto Rico prior to March 31, 1978. (Ad. 7).

6. On April 27, 1967, Martínez requested a $200,000 loan from the Bank, which loan was approved by the Board of Directors of the Bank on May 4, 1967. (Ad. 12–13).

7. In April of 1968 the unpaid balance of the loan was $83,000 and Martínez applied to the Bank for a loan of $200,000, payable on demand. (Ad. 14).

8. On May 23, 1968, the Board of Directors of the Bank approved the loan "with the signature of his [Martínez] wife." (Ad. 15).

9. On July 3, 1968, Amieiro executed a guaranty for the amount of $200,000. (Ad. 16; Exh. 10).

Judgment in default against all the defendants was entered on May 26, 1982.

4. Reference to the facts admitted in the pretrial order will be made hereafter as "Ad. ____". Reference to the exhibits admitted at trial will be made hereafter as "Exh. ____". Exhibits for plaintiffs are designated with numbers; defendants' exhibits with letters.

10. The credit facility established by the parties operated as a line of credit in which the borrowers made payments and obtained additional advances from time to time. (Exh. 10).

11. As of November 12, 1969, Martínez owed the Bank a balance of $138,000 in principal on his $200,000 line of credit after crediting all payments made. (Exh. 11).

12. On April 30, 1970, Martínez applied to the Bank for renewal of the $200,000 line of credit, and the application was approved by the Board of Directors of the Bank on May 14, 1970. (Ad. 17).

13. On July 7, 1970, Martínez applied to the Bank for an additional loan in the amount of $150,000, payable on demand, payment of which would be secured by the pledge of certain shares of capital stock of Banco de Economías, of which Martínez was the holder of record. The application was approved by the Board of Directors of the Bank on July 9, 1970, and this credit facility was operated as a line of credit. (Ad. 18; Exh. PPP).

14. Between November 12, 1969, and March 14, 1972, partial disbursements to Martínez under the two lines of credit totalled $380,000, and the amounts advanced were credited to Martínez's personal checking account with the Bank. (Exh. 11).

15. During that same period of time Martínez drew checks against his same personal account in the aggregate amount of $549,373.71, of which amount $379,613.71 were used by Martínez to purchase 7,339 shares of stock of Banco de Economías and shares of stock of another corporate entity named Commonwealth Loan Corp., $55,000 were given as a loan to a corporation of which he was a shareholder, $24,760 to repay personal loans and to pay legal fees related to his personal investment transactions, and $90,000 was given as a loan to two other corporations. (Exhs. 12 to 15, 21; testimony of W. de la Cruz, M. Carlo, L. Nazario, R. Durand).

16. By March 14, 1972, the total of all disbursements made under both lines of credit was $887,000. Of this amount, $537,000 in principal had been repaid, thus leaving an unpaid principal balance of $350,000 as of that date. (Exhs. 12, 13, 14, 21).

17. As of May 9, 1973, the total indebtedness of Martínez and Amieiro on both credit facilities continued to be the principal amount of $350,000. (Exh. 11). After that date, the bank did not make any additional disbursements nor did Martínez and Amieiro make any payments of the principal due and owing on said lines of credit. (Exhs. O, BB, TTT, UUU, VVV, DDDD, testimony of T. Niemczyk). Interest was paid in September 1975. (Finding number 18 below).

18. On or about September 11, 1975, the Bank issued two credit advices purporting to show two new loans in the amounts of $200,000 and $150,000, respectively, which represented the principal owed by Martínez and Amieiro on the outstanding lines of credit. The amounts in question were credited to Martínez's account with the Bank. On that same date the Bank debited Martínez's account in the amounts of $200,-512.35 and $150,384.28. As a result of these transactions the Bank collected the interest accrued to that date on the amounts due. The Bank did not actually disburse any money to Martínez and the principal indebtedness remained the same. (Exhs. 16–20).

19. On the same date of this purported loan transaction, Martínez executed and delivered to the Bank two promissory notes in the amount of $200,000 and $150,000, respectively, payable on demand, with interest at 8½% per annum, payable monthly. Payment of the $150,000 note was secured by the pledge of 10,964 shares of capital stock of Banco de Economías. (Exhs. 8–9).

20. No payments of principal on account on said notes have ever been made by Martínez and Amieiro. (Exhs. TTT, BB, O, UUU, VVV, DDDD, testimony of T. Niemczyk).

21. By 1975, Banco de Economías was submerged in a precarious financial condition due to the losses suffered, its unprofitable operations and its deficit of capital. Martínez, who had been President of Banco de Economías, switched positions with the

Chairman of the Board, Jorge Colón Nevárez, urged by supervisory authorities of the institution who suggested the change in an attempt to improve the condition of Banco de Economías. Martínez was fully aware of the situation of Banco de Economías that affected his major asset, the shares of capital stock of Banco de Economías owned by him and which had been pledged to secure payment of his obligation to the Bank. (Testimony of D. Kevane, J. Colón Nevárez, K. Hirschmann, Exh. 22). The examination of Banco de Economías by the examiners of the Secretary of Treasury of Puerto Rico and the FDIC disclosed a deficit in net capital and reserves of approximately $3.8 million at April 25, 1974. By July 7, 1975, the deficit had increased to approximately $22.3 million. (Exh. 22–1).

22. Commencing on or about May 9, 1975, Martínez, Amieiro, Vilma and Sesto engaged in a series of purported transactions with the purpose and effect of shielding their assets from the claims of creditors, including the Bank.

23. The lines of credit extended to Martínez and Amieiro by the Bank matured in May 1975. (Exh. B). On May 9, 1975, Martínez executed promissory notes payable to bearer in the aggregate amount of $285,000 and mortgages securing payment thereof, which encumbered five parcels of real property in his name and that of Amieiro. In each instrument so executed Martínez acted on behalf of Amieiro by means of a general power of attorney. (Exh. 24). The promissory notes were not negotiated by Martínez and Amieiro, who retained possession of same and no consideration was received by Martínez and Amieiro. (Exhs. 26 through 30). Another parcel of real property recorded in the name of Martínez and Amieiro was already mortgaged to secure payment of three promissory notes payable to bearer in the aggregate amount of $150,000. The six parcels were subject to mortgages totalling $435,000 following the transactions of May 9, 1975.

24. Certified financial statements for Martínez and Amieiro as of January 31, 1976, were prepared by the public auditing firm of Luis E. Cintrón & Co., with a certificate dated March 22, 1976. These statements disclose total real estate at a cost of $314,978 and estimated value of $836,055. The notes to the financial statements show first mortgages only in the amount of $74,363, collateralized by real estate with an estimated market value of approximately $121,500. The apparent discrepancy was not explained although Luis E. Cintrón, a certified public accountant, testified at trial. (Exh. O). The logical inference is that the properties were considered unencumbered since the mortgagors had not negotiated the notes secured by the mortgages. Nevertheless, an investigation in the property registry would disclose that the properties were encumbered. The financial statement as of January 31, 1976, was submitted to the Bank. (Exh. B).

25. On December 9, 1976, Vilmasor was incorporated in Puerto Rico. On December 16, 1976, Martínez and Amieiro, while still husband and wife, transferred to Vilmasor the six parcels of real property recorded in their names. The properties transferred were given an aggregate value of $579,000 in the deed. As consideration Martínez and Amieiro received 1,440 shares of preferred stock of Vilmasor of the par value of $100 per share, or a total value of $144,000. The deed further recited that Vilmasor retained $435,000 to satisfy the mortgages when due. (Exh 25). The only assets of Vilmasor at the time were the real properties so transferred. (Exh. 1–1).

26. On the same date, December 16, 1976, Martínez and Amieiro pledged to Lumaral six notes payable to bearer in the aggregate amount of $345,000, all secured by mortgages on the real properties transferred to Vilmasor. (Exh. 35). Among the notes listed in the pledge agreement is one in the amount of $75,000, payable to bearer on demand and secured by a mortgage created by deed number 8, executed on May 9, 1975, before notary Robert M. Sweeting. This deed was not presented as evidence and the note apparently is in addition to those referred to previously. This note and mortgage appear to correspond to

the first mortgage shown in the notes to financial statements referred to above in finding number 24. The pledge agreement executed on December 16, 1976, states that the notes secured by mortgages were pledged in substitution for ten unsecured notes identified in the instrument, all payable on demand, with the aggregate principal value of $350,024.90, purportedly made by Martínez in favor of Lumaral. However, the pledge agreement states that the principal of these unsecured notes is the total sum of $350,524.90. This discrepancy is not explained by the evidence. Lumaral was incorporated in Puerto Rico in 1963 with the name "Martínez Department Store, Inc." Sometime in 1972 the name was changed to "Lumaral Investment and Management Corp.", and finally, in 1975, the name was changed to "Lumaral Corp." (Exh. 1–2).

27. Following their divorce on January 19, 1977, Martínez and Amieiro executed on January 28, 1977, an instrument by which they purportedly divided the assets of their conjugal partnership. (Exh. F). This instrument awarded to Amieiro a list of assets identified in detail, including all of the shares of stock held by Martínez and Amieiro in Lumaral, Vilmasor, and Martínez Electric appliances Corporation; all right, title and interest of the conjugal partnership in the notes pledged to Lumaral; a note payable to bearer on demand in the amount of $50,000, secured by mortgage created on May 9, 1975; a parcel of real property in Aguadilla, Puerto Rico; all jewelry and articles of personal adornment and personal effects of Amieiro; and all household effects and furnishings located in the conjugal home in Aguadilla, Puerto Rico, as well as in an apartment located in San Juan, Puerto Rico. The document does not detail the conjugal assets assigned to Martínez, making reference only to "all the other assets or properties, shares, interests and rights of the said partnership [conjugal partnership of Martínez and Amieiro] that have not been subject of adjudication in favor of [Amieiro]." No express provision was made for payment of the debts of the conjugal partnership except the assumption thereof by Martínez of all said liabilities. (Exh. F).

28. On February 18, 1977, Vilmasor, represented by Martínez, sold one of the parcels of land which had been transferred to it by Martínez and Amieiro on December 16, 1976. The mortgage encumbering the parcel was cancelled. (Exhs. 31 and 32). The deed which cancelled the note and mortgage recites that the note had been acquired by endorsement to Vilmasor after repayment of the principal of the loan and interest, and that the note was then in possession of Vilmasor and was not assigned, endorsed nor encumbered in favor of any person. The note attached to the deed of cancellation of mortgage bears no endorsement of any kind. (Exh. 31). At the time of transfer to Vilmasor on December 16, 1976, this parcel of land was valued at $34,000. (Exh. 25). That amount in effect represented the cost to Vilmasor. The parcel was purportedly sold for $25,000 on February 18, 1977. (Exh. 32). The deed recites that Martínez acknowledged receiving that sum from the purchaser prior to the execution of the deed. (Exh. 32). It would thus appear that Vilmasor had suffered a loss of $9,000 in this transaction. The bookkeeping entries made by Vilmasor, however, reflect a different result. On January 31, 1977, prior to the date of the sale, the asset account for land was reduced by $34,000 (Exh. 52), and this amount was entered into an account opened to record the sale of property. (Exh. 59). These entries resulted from a journal entry dated January 31 in a column headed with the year "1977". (Exh. 57). On the same date another journal entry was prepared, increasing the cost of the property in the sale of property account in the amount of $812.50 and crediting accounts receivable from Amieiro in the same amount. (Exh. 57). The record of cash received was not made until May 1977, when a journal entry was prepared to record a series of cash transactions for that month. An undated item in that entry reflects the receipt of cash in the amount of $25,000. (Exh. 60). Although the note and mortgage in the amount of $25,000 which encumbered this parcel were can-

celled by a deed dated February 18, 1977 (Exh. 31), no record was made in the books of Vilmasor until December 31, 1977, when a journal entry was made to reflect the reduction in notes payable. (Exh. 58). This entry eliminates the apparent loss on the sale of this land by a credit to the sale of property account in the amount of $18,-573.36 and a credit to accounts receivable from Amieiro in the amount of $6,426.64 (Exh. 58). The explanation for this entry states: "To write off excess of cost registered in exchange of property which was sold in 1977." It thus appears that the loss on this transaction was converted into a gain by a series of bookkeeping entries, with no explanation of the reason for these entries. This series of transactions indicates that Amieiro received credits on her indebtedness to Vilmasor in the amounts of $6,426.64 and $812.50, or a total of $7,239.14 in lieu of the amount of $25,000 for which the property was mortgaged. Since the selling price was $25,000, and the gain reflected after this series of entries was $8,760.86 (Exh. 59), the actual cost of this property to Vilmasor was $16,239.14. The difference between this amount and the credit given to Amieiro in her indebtedness in the amount of $7,239.14 is $9,000, precisely the difference between the value placed on this property when transferred to Vilmasor and the mortgage which encumbered it. The $9,000 of preferred shares issued to Martínez and Amieiro in consideration of the transfer of this property thus appear to have been issued for no real value. Stated alternatively, the property was mortgaged for $25,000 and was sold for that amount some two months after its transfer to Vilmasor. The true value of the property would thus appear to be the amount for which it was mortgaged and therefore the preferred shares issued in consideration of the transfer of that property were issued without any real value being received by Vilmasor.

29. Two other properties transferred to Vilmasor on December 16, 1976, were sold on July 17, 1978, and the mortgages encumbering same were cancelled. This time Vilma represented Vilmasor in the execution of the deeds. (Exhs. 33 and 34). The deed cancelling the notes and mortgages makes no reference to payment of the notes nor their acquisition by Vilmasor, but rather, recites that Vilma has possession of the notes as president of Vilmasor, and having no need to negotiate same, desires to cancel the notes and delivers them to the notary for cancellation. (Exh. 33). The bookkeeping entries recording these transactions again do not accord with the deeds executed. Each of the two parcels was valued at $33,000 when acquired by Vilmasor in December 1976, and each was encumbered by a mortgage in the amount of $20,000. (Exh. 25). The parcels were sold for $12,500 each, or a total of $25,000. (Exh. 34). The account in which these parcels were recorded, entitled "Investment in Real Estate", shows a credit upon the sale in the amount of $66,000. (Exh. 66). A journal entry for December 1978 includes an item of $25,000 deposited in the bank, which is unidentified and undated. (Exh. 54). Nevertheless, the financial statements of Vilmasor as of January 31, 1979, disclose a sale of land at Cabo Rojo, Puerto Rico, for the amount of $69,869.38. The statement of income for the period ended on the same date includes a gain on sale of real property in the amount of $3,869.38. (Exh. G). The statement of changes in financial position for the same period reflects the elimination of notes payable in the amount of $42,000, $40,000 of which apparently correspond to the cancellation of the mortgages on these two parcels of land. Since the properties were recorded at a cost to Vilmasor of $66,000 and were sold for a total of $25,000, Vilmasor suffered an apparent loss of $41,000. It would also appear that there was no equity in the properties when transferred to Vilmasor since the mortgages totalled $40,000 and the selling price was $25,000. Again, it appears that the shares of stock of Vilmasor issued in consideration for the transfer of these properties were issued with no real value received by Vilmasor. The discrepancies between the deeds effecting the transfers of the properties and the bookkeeping entries relating thereto were not explained although the independent auditor and the person operating the bookkeeping

service of Vilmasor both testified during the trial.

30. The transactions recorded between May 1975 and early 1978 had the purpose and purported effect of placing almost all of the assets of Martínez and Amieiro in two corporations, Vilmasor and Lumaral, with Amieiro holding all or substantially all of the issued and outstanding stock of those corporations and leaving Martínez with no identified assets and a purported assumption of all liabilities of himself and Amieiro.

31. Commencing in January 1975 the market price of shares of Banco Economías declines steadily. (Exh. A). By June of 1977 the shareholders of Banco de Economías, of which Martínez was chairman of the board, were informed of a proposed purchase and assumption transaction involving the FDIC and Banco Central, S.A. of Madrid, Spain. The proposal contemplated liquidation of Banco de Economías and that shareholders would receive for each share of the bank's stock held a warrant to purchase for one dollar one share of the assuming bank during the month of May 1982. The proposal also provided for issuance of capital notes to be held by the FDIC and that the shareholders would receive nothing in respect of their contingent interest in the capital notes until the FDIC had been fully repaid for all expenses and losses incurred in the liquidation of $15,000,000 of assets which the FDIC had purchased, consisting mainly of adversely classified loans and the security therefor. The financial statements of Banco de Economías showed losses in excess of $4,000,000 for the year ended December 31, 1975, and in excess of $20,000,000 for the year ended December 31, 1976. The proxy statement distributed to the shareholders of Banco de Economías informed them that "you will not retain a share ownership in the Assuming Bank." (Exh. 4). The shares pledged by Martínez to secure payment of the indebtedness to Banco Crédito y Ahorro Ponceño were thus rendered valueless.

32. On or about March 31, 1978, the Secretary of the Treasury of the Commonwealth of Puerto Rico ("the Secretary") determined that the Bank was in an unsound financial condition to continue doing business and insolvent. Using as his authority Article 30 of the Banking Law of Puerto Rico, 7 L.P.R.A. § 202, the Secretary ordered the Bank closed, took possession of its assets and affairs and tendered to the FDIC the appointment as receiver of the Bank. Pursuant to 12 U.S.C. § 1821(e), the FDIC accepted appointment as receiver of the Bank as tendered by the Secretary. (Ad. 8–10).

33. On the same date, the FDIC, in its corporate capacity, and as authorized by 12 U.S.C. former § 1823(e), purchased from the Receiver certain assets of the Bank among which is the claim at issue in the present action. (Ad. 11).

34. On November 27, 1978, the FDIC notified Martínez at his San Juan post office address that it was the holder of his obligations and requested that he contact the FDIC to make arrangements for the prompt liquidation of his indebtedness. (Exh. WWW).

35. On January 31, 1980, an analysis of fixed assets was prepared by the auditors of Lumaral to record the sale of a building located in Isabela, Puerto Rico. (Exh. 47). According to that entry the sale had been made on May 9, 1975, but was not recorded in the books until January 31, 1980. The preliminary draft of the financial statements of Lumaral for the fiscal year ended January 31, 1980, were submitted to Amieiro as president of Lumaral on or about May 13, 1980. (Exh. 46). The preliminary draft initially reflected property leased to others shown at cost of $30,917 as of January 31, 1979. That property was not included among the assets as of January 31, 1980, and the statement of income and retained earnings reflected a gain on sale of property in the amount of $15,083. That gain is also reflected in the analysis of fixed assets referred to above. The statement of changes in financial position in the preliminary draft of the financial statements indicates proceeds from sale of property in the amount of $45,000 and an increase in notes and accounts receivable

from stockholders in the amount of $45,000. (Exh. 46). The preliminary draft was subsequently changed by handwritten notes made therein to reverse the entry recording the sale. The handwritten changes reduced notes and accounts receivable from stockholders by the amount of $45,000, restored the depreciated cost of the property of $29,917 to the balance sheet, and eliminated the gain on sale of property in the statement of income and retained earnings. The same auditors, Luis E. Cintrón & Co., prepared certified financial statements for Lumaral for each of the fiscal years ended January 31, 1975, through 1981. (Exhs. 43, 46 and 49). The same auditors also prepared the certified financial statements of Martínez and Amieiro as of January 31, 1976 (Exh. O), and another accountant, Víctor M. Simons, prepared the financial statements of Martínez as of December 31, 1976 (Exh. DDDD). None of those statements reflected the sale of the property which reportedly occurred on May 9, 1975. The analysis of the account entitled "Loans Receivable/Employees", on which the name of Amieiro was handwritten (Exh. 42), recorded the sale of the property in the amount of $45,000 on January 31, 1980. Beside the entry recording this sale the word "No" was handwritten. A footnote cross-referenced to that entry states "According to deed # 7". No entry was made in this account to eliminate the record of the sale. The purported date of the sale is the same date on which Martínez executed the six notes and mortgages referred to in finding 23 above. (Exhs. 26, 27, 28, 29 and 30). The entries as recorded in the accounting records of Lumaral would indicate that the sale had been made to Amieiro. On the purported date of the sale Amieiro was still married to Martínez. If the sale was actually made in 1975, then the financial records and statements of Lumaral, Martínez and Amieiro referred to above contained misrepresentations which had the effect of secreting assets of the shareholders of Lumaral. If, on the other hand, the sale was not actually effected, then the recording of the sale in the accounting records of Lumaral must have had some other purpose. Although accountants Luis E. Cintrón and Víctor M. Simons as well as Amieiro and Vilma testified during the trial, no explanation was offered. The evidence is probative at least of the unreliability of the accounting records and financial statements of the defendants.

36. The records of Vilmasor reflect that on or about February 1, 1980, Amieiro donated to her granddaughters, Vilma and Soraya Sesto, 300 of her shares of the preferred stock of Vilmasor. (Exhs. 69, I).

37. The records of Vilmasor reflect that fourteen days later, on February 15, 1980, Amieiro transferred back to Vilmasor her remaining 1,140 shares of the capital stock of said corporation with a total par value of $114,000 in exchange for the cancellation of her personal indebtedness of $98,287.20 to Vilmasor. The balance of $15,717,80 was then recorded in the books of Vilmasor as an account payable to Amieiro. (Exhs. 2, 69, K).

38. The records of Vilmasor reflect that on the same date, February 15, 1980, Amieiro assigned to Lumaral in payment of personal indebtedness of Amieiro and her daughter notes payable to bearer in the amount of $370,000 which had been previously pledged to Lumaral and which were secured by mortgages that encumbered the properties transferred to Vilmasor in 1976 by Amieiro and Martínez. Amieiro's debt purportedly amounted to $348,850.67, and Vilma's to $21,149.33. (Exhs. 2, 44, L, M). Although the note receivable from Amieiro, which was cancelled, bore interest at 6% per annum, the same was never recorded in the books of Lumaral nor collected from Amieiro. (Exhs. 2, 69).

39. The records of Vilmasor reflect that on or about February 15, 1980, Vilmasor issued 50 common shares of its capital stock to Vilma in payment for services rendered. The minutes of the meeting of the board of directors of Vilmasor held on February 15, 1980, recite the action related in findings 36, 38 and 39, without any further explanation. The minutes refer to the notes assigned to Lumaral as notes "of the corporation", whereas the notes were subscribed by Martínez. (Exh. 69). The same

error appears in the journal entry recording the assignment of the notes in the records of Lumaral, where the reference is to "exchange of notes from Inversiones Vilmasor, Inc." (Exh. 48). The nature of the services rendered by Vilma, or the dates when rendered, or the method of evaluating same are not detailed in the resolution relating to the issuance of the shares to Vilma. (Exh. 69).

40. The minutes of the meeting of directors of Vilmasor at which the transactions related in findings 36, 38 and 39 were approved engender additional doubt as to the reliability of the records maintained by defendants. There are two minutes drawn in identical language, although they are not exact duplicates, the spacing indicating that they were typewritten in separate operations. Both are signed by Amieiro as secretary and Vilma as president. One of these minutes is dated February 15, 1980, and the other is dated February 15, 1982. No explanation of this apparent discrepancy was offered by defendants. The dates are significant since the former antedates the institution of this action, while the latter is almost twenty months subsequent to the filing of the initial complaint in this action.

41. Vilma and Sesto had constructed and resided in a house on land owned by Martínez and Amieiro and on which the family home of Martínez and Amieiro was also located. The records of Vilmasor reflect that during the fiscal year ended January 31, 1979, Vilma and Sesto sold their house to Vilmasor for $70,000. The records show a down payment of $2,000 and equal monthly installments of $650. The transaction is not mentioned in the minutes of meetings of directors nor shareholders of Vilmasor. No payments of rent for the use of the house appear in the records of Vilmasor. (Exh. 2).

42. One of the properties owned by Lumaral was a penthouse apartment which was sold by the latter during 1979. Prior to the sale, the apartment was used by Amieiro as her personal residence although she never paid any rent. (Exhs. 2, O). The apartment was also shown as the principal office of Vilmasor and Lumaral in the domestic corporation reports of each filed with the Department of State of Puerto Rico. (Exhs. 1–1 and 1–2). The proceeds from the sale of said apartment were advanced by Lumaral to Amieiro for the purchase of an apartment in her name to be used as her personal residence (Exhs. 46, 54). The address of the apartment which had been sold in 1979 continued to be shown as the address of the principal office of Lumaral in the domestic corporation reports filed for the years 1980 and 1981. (Exh. 1–2).

43. As of January 31, 1981, the capital of Lumaral, as per the latter's financial statement, amounted to $738,752. This amount is broken down as follows: $123,614 represented by 1,236.14 shares of class A common stock with a par value of $100 per share, issued to Amieiro; $100,000 represented by 1,000 class B common shares with a par value of $100 per share issued to Vilma; $247,000 represented by 2,470 shares of preferred stock with a par value of $100 per share issued to Amieiro; and $268,138 recorded during 1980 as paid-in capital. This amount represented an account payable to a certain Martínez Electric Appliance Corp., a dormant corporation, which was cancelled. As consideration for the purchase of the shares issued to her, Vilma executed and delivered to Lumaral a note for $100,000 payable on demand, bearing interest at 5% per annum. The note was still outstanding at the time of trial and Lumaral had never recorded or collected any interest thereon. (Exhs. 1, 2, 43, 45, 59, H).

44. During the period from February 1, 1977, to January 31, 1982, the total income of Vilmasor and Lumaral amounted to $352,457. The amount disbursed by the corporation as expenses during that same period (property taxes, maintenance, insurance, taxes and licenses, and others) totalled $101,648. This left a balance of funds available of $250,809. Notwithstanding this, Amieiro, Vilma and Sesto, withdrew a total of $272,536 for their personal benefit. The sources and uses given to the funds received by both corporations were distributed as follows:

| Sources of Funds | | |
|---|---|---|
| Rents | $289,912 | |
| Gain on sale of properties | 62,545 | |
| Total of funds | | $352,457 |

Uses of Funds

| | | | |
|---|---|---|---|
| I. | Corporate expenses | | 101,648 |
| | Balance of funds available | | $250,809 |

II. Amounts withdrawn by Amieiro, Vilma and Sesto

| | | | |
|---|---|---|---|
| A. | Professional services paid to | | |
| | Vilma | $23,400 | |
| | Amieiro | 30,900 | |
| B. | Travel expenses paid to | | |
| | Vilma | 9,950 | |
| | Amieiro | 14,100 | |
| C. | Representation expenses paid to | | |
| | Vilma | 2,700 | |
| | Amieiro | 10,800 | |
| D. | Down payment and mortgage payments to Vilma and Sesto for purchase of house | 25,400 | |
| E. | Loans to | | |
| | Vilma and Sesto | 9,397 | |
| | Amieiro | 106,512 | |
| F. | Premiums of insurance policy on life of Martinez in which Vilma is sole beneficiary | 33,377 | |
| G. | Leasehold improvements on house used as personal residence of Vilma and Sesto | 6,000 | |
| | Total fund used by or disbursed for the benefit of Vilma, Sesto and Amieiro | | $272,536 |
| | Excess of amounts withdrawn by Amieiro, Vilma and Sesto over corporate income | | $21,727 |

45. All the amounts paid were disbursed through Vilmasor since Lumaral does not have a bank account. Vilmasor also receives and deposits the rent and income payable to Lumaral. The basic source of income of Lumaral and Vilmasor was the rentals derived from the properties that were originally transferred to them by Martínez and Amieiro. Nevertheless, no evidence was presented to justify the large amount of allowances paid to Vilma and Sesto for travel and representation expenses. Although the total amount received by Vilma and Amieiro amounted to $55,800 and $61,450, respectively, only $34,499 were reported by Vilma and $19,080 by Amieiro in their personal income tax returns for the same periods. (Exh. 2).

46. No tax was withheld from payments made to Amieiro and Vilma. The travel expenses and representation expenses recorded in the books of Vilmasor and Lumaral were not reimbursements of expenses incurred, nor amounts paid to third parties. Amieiro and Vilma drew a fixed amount per month, which was varied from time-to-time, and charged these expenses. The minutes of the corporations are silent as to compensation of officers or directors. The evidence presented does not disclose that either corporation had any other employees. For the fiscal year ended January 31, 1979, the amount of $8,200 recorded as professional fees paid by Vilmasor to Amieiro and Vilma were transferred to the travel expense account. (Exhs. 66 and 64). The only explanation given is "to reclassify as traveling expense."

47. From the time of its incorporation and up to the time of trial, the only directors and officers of Vilmasor were Amieiro, Vilma and Sesto. (Exh. 1–1). In Lumaral, the directors in 1974 and 1975 were Martínez, Amieiro and Vilma. The same persons were the officers with the addition of one other person as secretary and assistant treasurer. Commencing with the year 1976 and thereafter the only directors and officers of Lumaral were Amieiro, Vilma and Sesto (Exh. 1–2).

48. The pattern of the transactions here related, the confusing and sketchy records of these transactions, the failure of defendants to suggest any sound business reasons for these transactions, and the effect of these transactions on the financial condition of the individual defendants leads to the conclusion that Vilmasor and Lumaral were utilized by Martínez, Amieiro, Vilma and Sesto as repositories for the assets of Martínez and Amieiro where those assets would not be readily subject to the claims of creditors of Martínez and Amieiro. The intention of the defendants was to deprive the creditors of Martínez and Am-

ieiro of a source for satisfaction of their claims while preserving to the defendants the income from those sources. The corporations, Vilmasor and Lumaral, do not have separate personalities from the individual defendants who control them but are mere extensions of the personalities of the latter.

49. The scheme by which the defendants attempted to shield the assets from the creditors of Martínez and Amieiro, and particularly the Bank and the FDIC after the closing of the Bank, commenced with the creation of the mortgages in May 1975 and was continuing at the time of trial. Some of the significant acts in furtherance of the scheme occurred in February 1980. The discrepancy in dates on the minutes of the meeting of directors referred to in finding number 40 above suggests that the action may have been taken in 1982 and the documents prepared to reflect an earlier date.

### Conclusions of Law

The FDIC is a federal corporation created in 1933 by an Act of Congress "to promote the soundness of banking and to aid the government in the discharge of its fiscal transactions." *Freeling v. FDIC,* 221 F.Supp. 955 (W.D.Okla.1962). Its overall purpose is to protect the public interest and promote confidence in the banking system. *FDIC v. Rockelman,* 460 F.Supp. 999, 102 (E.D.Wis.1978). As a federal corporation it is expressly authorized to sue or be sued, and when it sues in its corporate capacity, such suit "shall be deemed to arise under the laws of the United States." 12 U.S.C. § 1819.

In this case the claim is brought by the FDIC in its corporate capacity (Pretrial Order ¶ 11); consequently, the rights and obligations of the parties present a federal question which must be determined by federal law. *D'Oench Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 455–6, 62 S.Ct. 676, 678–79, 86 L.Ed. 956 (1942). The more difficult task is determining exactly what federal rule, in the absence of specific statute, will be followed with respect to a particular claim for relief or defense thereto. Although Congress created the corporation, it did not attempt to regulate each and every contract, transaction, obligation or claim arising therefrom which conceivably could be acquired from a closed insured bank, and which subsequently becomes the object of litigation to which the FDIC is a party. Neither did Congress attempt to regulate all situations in which the FDIC, in its corporate capacity, could be involved because of conduct or activity detrimental to its role as insurer.

The issues involved in this case derive in part from assets acquired from the closed bank pursuant to 12 U.S.C. § 1823(c)(2), and in part from conduct aimed at defrauding the insured bank and the FDIC with respect to those assets. Even though those issues are to be resolved under federal law, such law must be ascertained from the Constitution, existing statutes or common law. The latter is said to "implement [ ] the federal Constitution and statutes, and is conditioned by them." *D'Oench,* 315 U.S. at 472, 62 S.Ct. at 686. (Jackson, J., concurring). Aside from the provisions of the Federal Deposit Insurance Act, 12 U.S.C. § 1811, *et seq,* and the protective policy formulated by the Supreme Court in relation thereto, *D'Oench,* 315 U.S. at 457–460, 62 S.Ct. at 679–80,[5] it will be necessary to fashion appropriate rules for resolving each of the various controversies before the Court.

---

5. The protection afforded the FDIC with respect to transactions of third parties with insured banks has been reiterated and applied by other courts in different situations. *Federal Deposit Insurance v. De Jesús Vélez,* 678 F.2d 371, 375 (1st Cir.1982); *Chatham Ventures, Inc. v. Federal Deposit Ins. Corp.,* 651 F.2d 355, 361–362 (5th Cir.1981); *FDIC v. Hoover–Morris Enterprises,* 642 F.2d 785, 787–788 (5th Cir.1981); *FDIC v. First Nat. Finance Company,* 587 F.2d 1009, 1011–1012 (9th Cir.1978); *FDIC v. Meo,* 505 F.2d 790, 791–793 (9th Cir.1974); *FDIC v. Alker,* 164 F.2d 469, 470 (3rd Cir.1947); *Dasco, Inc. v. Am. City Bank & Trust Co.,* 429 F.Supp. 767, 770 (D.Nev.1977); *British Col. Inv. Co. v. FDIC,* 420 F.Supp. 1217, 1224 (S.D.Cal.1976); *FDIC v. Vineyard,* 346 F.Supp. 489, 493 (N.D.Texas 1972). *See also,* the excellent discussion of the functional operation of the FDIC in *Rauscher Pierce Refsnes, Inc. v. FDIC,* 789 F.2d 313, 314–5 (5th Cir.1986).

The federal policies deriving from the Act provide a different and perhaps unique framework within which FDIC claims and defenses thereto are to be resolved, particularly where the issue at bar implicates or relates to "nationwide federal programs." *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 724, 99 S.Ct. 1448, 1456, 59 L.Ed.2d 711 (1979). Although in some instances adoption of a uniform federal rule is not required, *Id.*, at 728–729, 99 S.Ct. at 1458–59, and state law may be incorporated to determine the rights of the FDIC, *Id.*, such an exception requires an underlying determination of "whether application of state law would frustrate specific objectives of the federal programs." *Id.* If so, "special rules solicitous of those federal interest" must be fashioned. *Id.*

Guided by the principles outlined by the Supreme Court in the *Kimbell* opinion, the issues presented will now be examined and resolved.

### A. *Standing of the FDIC*

The standing of the FDIC to bring the present action was raised as an affirmative defense. The issue was listed in the pretrial order. Nevertheless, the defendants adduced no evidence or presented any motions addressed to that issue. To the contrary, they made the following admissions in the same pretrial order:

9. Using as his authority Article 30 of the Banking Law of Puerto Rico, 7 L.P.R.A. § 202, the Secretary [of the Treasury of the Commonwealth of Puerto Rico] unilaterally ordered the Bank closed, took possession of its assets and affairs and tendered to the FDIC the appointment as receiver of the Bank.

10. Pursuant to 12 U.S.C. § 1821(e), the FDIC accepted appointment as receiver of the Bank as tendered by the Secretary.

11. The FDIC, in its corporate capacity, and using as its authority 12 U.S.C. § 1823(e), purchased from the receiver certain assets of the Bank. Among the assets acquired in this manner from the receiver by the FDIC in its corporate

capacity was the claim related in the complaint in this action.

The procedure followed by the FDIC is legislatively authorized, 12 U.S.C. § 1823(e) (West 1986 Supp.), and judicially sanctioned. *FDIC v. de Jesús Vélez*, 514 F.Supp. 829 (D.P.R.1981), *aff'd*, 678 F.2d 371 (1st Cir.1982); *Brown v. New York Life Ins. Co.*, 152 F.2d 246 (9th Cir.1945); *Lamberton v. FDIC*, 141 F.2d 95 (3rd Cir. 1944); *FDIC v. Rectenwall*, 97 F.Supp. 273 (N.D.Ind.1951); *FDIC v. Abraham*, 439 F.Supp. 1150 (E.D.La.1977); *see also, FDIC v. La Rambla Shopping Center, Inc.*, 791 F.2d 215, 218–220 (1st Cir.1986).

■ Absent any evidence or legal basis for the defense, it must be concluded that the FDIC does have standing to bring this action on the claims presented in the complaint.

### B. *No Extinctive Novation Occurred*

Defendants also claim that Martínez's original obligation was extinguished by novation, consequently releasing Amieiro from all liability that she might have had on the original indebtedness. The defense appears to be based on Article 1158 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3242, which provides that an obligation may be extinguished by another which substitutes it when the latter so expressly declares, or the old and new obligations are "incompatible in all points."

Reliance is placed by the defendants on a certain pledge agreement by and between the Bank and Martínez and his second wife, Karelia Brito de Martínez, on September 9, 1977. (Exh. Q). The agreement in question contains neither an express nor an implied declaration of an intention to extinguish any prior obligations of Martínez. The intention of the parties, as clearly stated in the pledge agreement, was merely to provide security for obligations to the Bank, "present or future, direct and contingent, due or to become due ..." of Martínez and his then wife, Karelia Brito-Geli. No mention is made in the document, other than the reference to "present" obligations, to the outstanding loans of Martínez as of the date of the agreement.

Defendants further rely for their contention that there was a novation, on certain correspondence by and between the Bank and Martínez relating to a repayment plan requested by and granted to the latter by the Bank. (Exhs. BB, CC, ZZ, BBB, EEE, QQQ). The letters in question merely show that Martínez had on various occasions attempted to agree on a plan with the Bank for the payment of his obligations. Finally, on November 14, 1977, Martínez was notified by José A. Figueroa, Vice–President of the Bank, that the Board of Directors of the Bank had approved the plan that they had previously discussed by which the Bank would accept monthly payments of $1,000 of interest, for a period of 12 months, after which the matter would be reviewed in order to establish a more adequate payment plan. (Exh. QQQ). On November 19, 1977, Martínez replied to Figueroa forwarding his first check in accordance with the plan. (Exh. EEE).

■ There is no suggestion in the letters nor in any other document admitted into evidence of an intention to substitute or extinguish an obligation existing at the time that the payment plan was approved by the Bank. Even if Martínez did intend to substitute his old obligations with a new one, a finding that is not supported by evidence of any kind, the consent of the Bank to such substitution is an essential element of novation which is missing in this case. *Cámara Insular, Etc. v. Santiago*, 83 P.R.R. 574, 580 (1961); *Ríos v. Rosaly*, 50 P.R.R. 652 (1933); *Bou v. Colorado*, 24 P.R.R. 125 (1916).

"[N]ovation, whether it refers to the subject or to the object of the obligation, is never presumed, but it must be established without any sort of doubt." *Caribe Lumber Corp. v. Marrero*, 78 P.R.R. 826, 833 (1955). This basic principle was reaffirmed in *Warner Lambert Co. v. Tribunal Superior*, 101 D.P.R. 378 (1973), in which the Supreme Court of Puerto Rico urged the courts "to examine with caution the particular circumstances of each case to make

the determination of whether there has been an extinctive novation or not." *Id.*, at 392. Speaking for the court, Justice Rigual stated:

> The novatory will—the intention to extinguish the obligation substituting it by a new one—is thus an indispensable requisite for the novation. The will must be manifest; it cannot be based on equivocation. Art. 1158 [of the Civil Code, P.R. Laws Ann., tit. 31, § 3242] uses radical language: "it is necessary that it should be so expressly declared".

*Id.*, 101 D.P.R. at 390 (translation supplied).

■ The element of the expressly declared novatory will is absent in the case at bar. The payment plan agreed upon by Martínez and the Bank did not result in an incompatibility of two obligations. The evidence before the Court shows that the purpose of the plan or agreement worked out by the parties was to aid Martínez to meet his obligations and the Bank to collect the amounts due and owing on the loans. The Bank retained the same notes executed by Martínez in 1975 while he was married to Amieiro.[6] The extension of the term given to Martínez for payment of the loans did not affect the nature of the obligations and did not constitute a novation. *Miranda Soto v. Mena Ero*, 109 D.P.R. 473, 479–480 (1980); *Colón & Cía., Inc. v. Registrar*, 88 P.R.R. 77, 80–81 (1963); *Caribe Lumber Corp. v. Marrero*, 78 P.R.R. at 835. The changes in the terms of payment of the obligations were not sufficient by themselves to produce an extinctive novation because they were not incompatible with the original obligations, a fundamental element required by Article 1158 of the Civil Code of Puerto Rico, P.R.Laws Ann., tit. 31, § 3242. *Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64, 76–77 (1983).

The letter of guarantee executed by Amieiro contains language amounting to a relinquishment with respect to all of the acts which may be deemed a novation. Amieiro cannot now disclaim liability when she relies on that very same document for her

---

**6.** It has been held that the substitution of new evidence of the indebtedness for the old evidence, such as a new promissory note, does not per se constitute a novation. *Caribe Lumber Corp. v. Marrero*, 78 P.R.R. at 833–834.

contention that her liability, if any, is limited by the terms thereof. *FDIC v. Panelfab Puerto Rico, Inc.*, 739 F.2d 26, 30 (1st Cir.1984).

The defense also implicates federal law. In order for the pledge agreement dated September 9, 1977, or any other agreement, to be effective in releasing Amieiro of her obligations, the four conditions of 12 U.S.C. § 1823(e) would have to be met. There is no evidence in the record that the board of directors or its loan committee ever approved such an agreement.

Defendants' contention that the original obligation of Martínez was extinguished by novation has no basis either in fact or in law.

### C. Statute of Limitations

Defendants contend that the action of the FDIC on the notes executed by Martínez on September 11, 1975, is time barred by the applicable statute of limitations. The notes in question were acquired by the FDIC on March 31, 1978, which then filed the original action against Martínez and Amieiro on July 3, 1980.

■ Actions by the FDIC on assets purchased from the receiver of a closed bank are subject to the six-year statute of limitations provided by 28 U.S.C. § 2415(a) if the claim sounds in contract, and to the three-year period if it sounds in tort, 28 U.S.C. § 2415(b). *FDIC v. Bird*, 516 F.Supp. 647, 650 (D.P.R.1981); *FDIC v. Cardona*, 723 F.2d 132, 134 (1s Cir.1983); *FDIC v. Barrera*, 595 F.Supp. 894, 989 (D.P.R.1984).[7] The acquisition by the FDIC of the claims asserted in this action, would not have revived any claims which were already time barred by the applicable Puerto Rico statute of limitations. *FDIC v. Consolidated Mortgage and Finance Corp.*, 805 F.2d 14, 17 n. 4 (1st Cir.1986); *FDIC v. Bird*, 516

F.Supp. at 650. It is necessary therefore to ascertain whether the claims at issue were time barred when the FDIC acquired same.

#### 1. The action on the promissory notes

The law of Puerto Rico establishes two different periods of prescription for actions on promissory notes depending on whether the note is commercial or non-commercial. Actions on commercial notes are subject to the three-year term fixed by Article 946 of the Commerce Code, 10 L.P.R.A. § 1908, while a non-commercial note is subject to the fifteen-year period of prescription provided by Article 1864 of the Civil Code, 31 L.P.R.A. § 5294. *FDIC v. Barrera*, 595 F.Supp. at 898; *Mediterranean Inv. Corp. v. Rodríguez*, 575 F.Supp. 268, 269 (D.P.R. 1983).

If the notes executed by Martínez on September 11, 1975, are non-commercial, then the FDIC would have until September 11, 1990, to bring the action in accordance with the limitations period established by Article 1864 of the Civil Code. The situation would be different if, as defendants contend, the notes are commercial in nature and therefore governed by the three-year limitations statute of the Commerce Code.

■ Two conditions must be met in order to establish the commercial nature of a loan under the law of Puerto Rico, to wit: 1) that one of the contracting parties be a merchant; and 2) that the proceeds of the loan were destined to commercial transactions. Article 229 of the Commercial Code of Puerto Rico, 10 L.P.R.A. § 1651; *FDIC v. Cardona*, 723 F.2d at 133–134; *FDIC v. Barrera*, 595 F.Supp. at 898; *Mediterranean Inv. Corp. v. Rodríguez*, 575 F.Supp. at 269. The fact that a bank is one of the parties to a loan does not necessarily render the loan mercantile in nature. *Banco*

---

7. In *FDIC v. Cardona*, 723 F.2d 132, (1st Cir. 1983), the court did not reach the question of whether the six-year federal statute curtailed the time remaining under a certain local statute of limitations when the latter exceeded the six-year term. The court noted that it did not think "the legislature's intent in enacting 28 U.S.C. § 2415 was to place the government at such a serious disadvantage relative to private parties suing on

similar obligations." 723 F.2d at 134. In a recent opinion, *FDIC v. Roldán Fonseca*, 795 F.2d 1102 (1st Cir.1986), the Court of Appeals suggested, without deciding, that the FDIC may enjoy a longer limitations period than that provided by the federal statute when the state limitations period is longer and has not expired. *Id.*, 1108–09.

*de Puerto Rico v. Rodríguez*, 53 P.R.R. 430, 433 (1938); *FDIC v. Cardona*, 723 F.2d at 135; *Mediterranean Inv. Corp. v. Rodríguez*, 575 F.Supp. at 269. Article 229 of the Commercial Code is to be taken in conjunctive form and therefore both circumstances set forth by said article must be proven in order to establish the commercial character of a loan. *Luengo v. Fernández*, 83 P.R.R. 613, 615–616 (1961); *Franceschi v. Rivera*, 44 P.R.R. 640, 641 (1933); *FDIC v. Barrera*, 595 F.Supp. at 898; *FDIC v. Marco Discount House*, 575 F.Supp. 730, 732 (D.P.R.1983). "The statute of limitations is ordinarily an affirmative defense and the elements that give rise to the limitation of an action must be pleaded and proved by the defendant." *FDIC v. Cardona*, 723 F.2d at 134–135. Defendants here did not discharge their burden of presenting evidence of the commercial nature of the notes at issue in this case. Defendants' reliance on certain letters, loan offerings and other documents of the Bank referring to the loans evidenced by the notes executed by Martínez as "commercial" is misplaced. *Id.*, at 135. Enrique Sanz, a former officer of the Bank, testified that all loans which were not installment or mortgage loans were classified as "commercial loans" by the Bank. Such classification was for operational purposes and not an attempt at classification pursuant to legal definitions. Even when a loan is requested for commercial purposes, absent proof that it was ultimately destined for commercial activities, it cannot be concluded that it is a commercial loan. Santa–Pinter, J.J. "Comentarios al Código de Comercio" § 90, at 134 (1964).

 The failure of defendants to discharge their burden of establishing the commercial nature of the transactions is a sufficient ground for overruling the defense of limitations. Nevertheless, based on the evidence presented by plaintiff relative to the disposition of the proceeds, we conclude that the obligations are non-commercial in nature.

The evidence in question, in the form of cancelled checks, bank statements and oral testimony uncontroverted by the defendants, established that the proceeds of the loans taken by Martínez were used by Martínez for personal purposes. The notes executed by Martínez on September 11, 1975, in the amounts of $200,000 and $150,000 did not involve further disbursements by the Bank, but merely represented the balance due and owing by Martínez on the two lines of credit. The nature of the loans, therefore, will be determined by the use given to the funds borrowed by Martínez on the lines of credit which remained unpaid and evidenced by the notes executed in 1975.

The uses given to the proceeds of the loans appear in numbers 12–15 of the findings of fact. *Ante*, at 857. The investments, loans and payments of obligations made by Martínez with the proceeds of the loans are not acts of commerce nor can they be considered commercial transactions within the scope of the Code of Commerce. *See, Blondet v. Garau*, 47 P.R.R. 820 (1934); *Salgado v. Villamil*, 14 P.R.R. 437 (1908).

At the time of the loans in question Martínez was president of a banking institution. There is no evidence that he was engaged in the business of trading in stocks. Neither the expressed purpose of the loan, nor the utilization to which the proceeds are put, by itself is sufficient to determine the nature of the transaction. All of the attendant circumstances must be examined. *Barceló & Co., S. en C. v. Olmo*, 48 P.R.R. 239, 241 (1935). The circumstances in which the loans at issue here were granted convincingly point to a non-commercial character of same.

In *Banco de Puerto Rico v. Rodríguez*, 53 P.R.R. 166 (1983), a commercial bank brought action on a note, the proceeds of which had been disbursed from time-to-time to the maker at his convenience. The maker acknowledged having utilized part of the proceeds for personal use and part for commercial purposes. The Supreme Court of Puerto Rico held that the loan was a non-commercial transaction in view of the personal use made of part of the funds, upholding the findings of the trial court on this point. The Court further stated:

Upon examining the evidence in the light of the law, of the foregoing decisions, motives of the legislators, and commentaries, we find the case indeed somewhat doubtful. The courts are inclined not to apply the statute of limitations unless the mercantile character of the transaction clearly appears, since it involves a relatively short term and debts whose existence is not even questioned. Following this trend and giving the judgment of the trial judge all the weight to which it is entitled, we must give plaintiff the benefit of the doubt....

53 P.R.R. at 173. The situation in the instant case is very similar to that of *FDIC v. Francisco Inv. Corp.*, 638 F.Supp. 1216 (D.P.R.1986) (proceeds of loan to corporation used to acquire shares of stock of another corporation).

Finding that the loans evidenced by the notes at issue in this action are non-commercial in nature, the applicable statute of limitations is that of 15 years as prescribed in Article 1864 of the Civil Code, 31 L.P.R.A. § 5294. The action having been filed within the 15–year term, the defense of prescription is without merit.

■ Assuming, arguendo, that the loans were governed by the three-year statute of the Commerce Code, a finding not supported by the evidence presented at trial, the period was interrupted by Martínez' acknowledgements of the debt in various correspondence with the Bank (Exhs. S, CC, EEE), and in his financial statement as of January 31, 1976, and dated March 22, 1976. (Exh. O). *FDIC v. Cardona*, 723 F.2d at 136–137. The action was alive at the time that the FDIC acquired the notes on March 31, 1978. The six-year period of limitations for actions on contract provided by 28 U.S.C. 2415(a) did not commence to run until the date when the FDIC acquired the notes from the receiver of the closed bank. *See, FDIC v. Roldán Fonseca*, 795 F.2d at 1108–1109 (1st Cir.1986); *FDIC v. Cardona*, 723 F.2d at 134. Therefore, the action on the notes brought in 1980 was timely.

### 2. *The action against Vilmasor, Lumaral and the other individual defendants*

The limitations defense asserted with respect to the action based on the concealment of properties of Martínez and Amieiro is grounded on another section of the Civil Code of Puerto Rico. Under the law of Puerto Rico the action to rescind contracts made in fraud of creditors must be brought within four years. Article 1251 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3500. The Code does not specify the time from which the four-year term commences to run. Manresa, commenting on article 1299 of the Spanish Civil Code, similar to article 1251 of the Civil Code of Puerto Rico, opines that the term is computed from the date of execution of the contract. 8 Manresa, "Comentarios al Código Civil Español", at 808 (6th ed. 1967). Said interpretation follows the criteria embodied in Article 1301 of the Spanish Civil Code, similar to Article 1253 of the Civil Code of Puerto Rico, which fixes a similar four-year term for actions for nullity of a contract and specifically states that in cases of error or deceit or falsity of consideration the term shall begin to run from the date of the consummation of the contract. 31 L.P.R.A. § 3512. The four-year term had not expired when the unacceptable assets of the Bank were purchased by the FDIC on March 31, 1978. Both the mortgage liens created in May 1975 and the conveyance of real properties to Vilmasor in December 1976 occured within four years of March 31, 1978.

Since the statute of limitations applicable to actions brought by the FDIC in its corporate capacity is governed by 28 U.S.C. § 2415, *FDIC v. Bird*, 516 F.Supp. at 650; *FDIC v. Cardona*, 723 F.2d at 134; *FDIC v. Barrera*, 595 F.Supp. at 898, it is necessary to determine whether the present action is one sounding in tort or one based on contract.

The case of *United States v. Franklin National Bank*, 376 F.Supp. 378 (E.D.N.Y. 1973), considered this issue:

The three year statute of limitations contained in § 2415 applies to all actions

"founded upon a tort". Although there is almost no case law construing this section, what little authority there is makes it clear that in applying the statute we must look beyond the face of the complaint to the underlying nature of the action. (Citations omitted). The defendants argue that the nature of the substantive right involved in this action is the right to recover damages sustained as a result of another's wrongful act. In *Hearn 45 St. Corp. v. Jano*, 283 N.Y. 139, 27 N.E.2d 814 (1940), however, the New York Court of Appeals found that the right underlying an action pursuant to the N.Y. Debtor and Creditor Law is the right of a creditor to receive payment due to him:

> The gravamen of the cause of action in the case at bar is the ordinary right of a creditor to receive payment; this right has been implemented by the protection of legislation concerning the circumstances under which the creditor may avail himself of assets which the debtor has transferred to others.

283 N.Y. at 141, 27 N.E.2d at 816.... Thus, the right upon which an action to set aside a fraudulent conveyance is based is not the right to recover damages sustained from the wrongful action of the grantee, but rather the right of the creditor to protect and preserve his interest in the debtor's properties. This right would appear to be founded in equity, not in tort.

376 F.Supp. at 383–384.

■ The nature of the action to set aside conveyances in fraud of creditors in Puerto Rico is also different from an ordinary action for damages. That this is so is evident from the fact that Puerto Rico provides a different limitations period for the former. Ordinary damage actions are governed by Article 1868 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 5298, with a limitations period of one year. The action to rescind transactions in fraud of creditors, as noted above, is governed by another article of the Civil Code providing a four-year limitations period. This Court agrees with the *Franklin National Bank* case that the limitations period applicable to this claim is the six-year term rather than the three-year term applicable to actions for money damages founded upon a tort. 28 U.S.C. § 2415. The defense of limitations does not bar this action since it was brought within six years after the right of action accrued on March 31, 1978.

■ Even were we to rule that the action sounds in tort, the result would not be different. The terms provided by 28 U.S.C. § 2415 are expressly subject to the provisions of 28 U.S.C. § 2416. The latter provides that in computing the limitations periods, "there shall be excluded all periods during which— ... (c) facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances; ...". The evidence before the Court does not disclose the date on which the FDIC became aware of the attempts to conceal the properties. The initial action which named only Martínez and Amieiro as defendants was filed on July 3, 1980, within three years of March 31, 1978. Judgment by default was entered against Martínez in that action on November 17, 1980, more than four months later. The action against the other defendants was initiated on July 17, 1981, eight months after that judgment, and approximately three years and three months after March 31, 1978. It is logical to infer that endeavors to locate assets subject to the execution of the judgment against Martinez led to discovery of the transfers of the properties. At least the defendants have presented no contrary evidence to sustain the defense. The exclusion pursuant to section 2416 of the period between March 31, 1978 and November 17, 1980, or even any period of four months or more, would make the action timely even if founded in tort.

■ There is yet another reason for finding the action to be timely. The complaint charged and the evidence established a conspiracy among defendants to defraud the creditors of Martínez and Amieiro and to appropriate the assets of these debtors for the benefit of Amieiro and her family to

the detriment of the creditors. Mindful of the teaching of *Kadar Corp. v. Milbury,* 549 F.2d 230 (1st Cir.1977), that the injury and damage in a civil conspiracy action flow from the overt acts, not from the mere continuance of a conspiracy, *id.,* at 234, we examine the principal overt acts in this case. The creation of the mortgage liens in May 1975 did not actually cause damage to creditors since in the absence of negotiation of the notes secured by the mortgages the assets available to creditors were not reduced. The conveyance of the real properties to Vilmasor in December 1976 was an attempt to conceal the true ownership of the properties, but Martínez and Amieiro thereafter held the issued and outstanding shares of stock of Vilmasor. The pledge to Lumaral in December 1976 of the notes secured by the mortgages likewise did not reduce the net value of the assets still in possession of Amieiro since the cancellation of the unsecured notes in the same transaction preserved the status quo. Lumaral was completely controlled by Amieiro, Vilma and Sesto, as was Vilmasor. A transfer of assets between the two corporations in effect did not reduce the aggregate fund available to creditors of Amieiro since neither of the corporations had substantial liabilities owing to others. The principal liability of Lumaral was the account payable to Martínez Electric Appliance Corporation in the amount of $268,-138, which was cancelled in 1980. Exhs. 1–1, 1–2. Following the purported division of the conjugal partnership property in January 1977, Amieiro continued to hold the stock of Vilmasor and Lumaral formerly held by Martínez and herself. As will be explained below, this division was actually a nullity for failure to comply with statutory requirements. The sales of properties by Vilmasor for less than the book value thereof perhaps did reduce the asset fund, but the record is insufficient for a determination of the "true" value of those properties at the time.

The actual injury and damage to the creditors of Martinez and Amieiro resulted from passing the income from the properties through the corporate shell of Vilmasor so as to create an apparent liability of Amieiro to the corporation, and then the purported satisfaction of that liability by the transfer of the shares of stock back to the corporation. The overt acts which would effectively place the assets beyond the reach of creditors, if sustained, actually commenced in February 1980. These acts included the transfer of the shares to Vilmasor, and the issuance of shares of Vilmasor to Vilma apparently without consideration. These acts placed the principal assets in Vilmasor and purported to terminate Amieiro's proprietary interest in that corporation.

The acts in 1980 occurred after the closing of the Bank and were directed particularly against the FDIC. The FDIC, as a creditor, was directly damaged by these overt acts which occurred within three years of the filing of the complaint. Although the conspiracy commenced in 1975 and was continuing at the time of trial, those acts in 1980 did more than shield the assets from the scrutiny of the creditors. Those acts, unless voided, would place the assets in large part beyond the reach of creditors. Thus, even applying the limitations period for actions founded on a tort, the action was timely.

▆▆ The defense of "laches" raised by the defendants must likewise be overruled. The defense of laches is not available against the FDIC when it brings an action in its corporate capacity. *FDIC v. Roldán Fonseca,* 795 F.2d at 1109.

### D. *Claims or Defenses Against the Closed Bank May Not be Asserted Against the FDIC*

In their answer to the second amended complaint, defendants raised certain defenses charging the Bank with having "waived the present cause of action", having charged an "usurious commission" and having "breached the Truth-in-Lending Act."

The defenses may be summarily dismissed for defendants' failure to present evidence at trial sufficient to permit making a finding sustaining them. As a matter of federal law those defenses cannot be

raised against the FDIC in its corporate capacity in actions such as the present even if the evidence were sufficient on the issue.

 Defendants apparently assume that their rights against the FDIC are the same as their rights, if any exist, against the closed bank. The FDIC is not a successor-in-interest nor can it be saddled with liabilities of the closed bank. *FDIC v. De Jesús Vélez*, 514 F.Supp. at 834; *FDIC v. Bird*, 516 F.Supp. at 650 n. 2; *FDIC v. Vogel*, 437 F.Supp. 660, 663 (E.D.Wis.1977); *FDIC v. Abraham*, 439 F.Supp. 1150, 1151 (E.D.La.1977). In *FDIC v. Tito Castro Const.*, 548 F.Supp. 1224 (D.P.R.1982), addressing this point, this Court stated:

> Moreover, in furtherance of this congressional scheme [to promote the stability of, and confidence in, the banking system], the FDIC in its corporate capacity does not simply step into the private shoes of local banks, thereby becoming subject to all defenses which may have been available against such banks. See 12 U.S.C. § 1823(e); *Gunter v. Hutcheson*, [674 F.2d 862 (11th Cir.), *cert. denied*, 459 U.S. 829, 103 S.Ct. 60, 74 L.Ed.2d 63, *petition for reh'g denied*, 459 U.S. 1059, 103 S.Ct. 477, 74 L.Ed.2d 624 (1982)]; *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. at 472, 62 S.Ct. at 686 (Jackson, J., concurring).

548 F.Supp. at 1226. *Cf., Southern Industrial Realty, Inc. v. Noe*, 814 F.2d 1 (1st Cir.1987) (the FDIC has a complete defense to state and common law fraud claims on a note it acquired for value, in good faith, and without actual knowledge of fraud at the time of acquisition).

 Defendants here have failed to establish their allegation of usury. No inference or presumption can be made from the face of the notes and loan documents presented that there was any violation of the usury statute. It is therefore unnecessary to resolve the difficult question of the applicability of the Puerto Rico usury statute in an action by the FDIC. *Federal Deposit Ins. Corp. v. Tito Castro Cons.*, 741 F.2d 475, 477 (1st Cir.1984).

### E. *Liability of Amieiro*

We now reach the issue of the liability, if any, of Amieiro for the loans taken by Martínez, and the extent of said liability.

 At the time of the execution of the $150,000 and $200,000 notes on September 11, 1975, Martínez and Amieiro were married to each other. They had been married in Puerto Rico in 1938. Their marriage lasted until January 19, 1977, when they were divorced in Puerto Rico. As domiciliaries of, and having been married in, Puerto Rico, Martínez and Amieiro are bound by the laws of Puerto Rico relative to family rights and obligations. Article 9 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 9.

 Under the law of Puerto Rico, a conjugal partnership is established by the act of marriage. *Int'l Charter Mortgage Corp. v. Registrador*, 110 D.P.R. 862, 965 (1981). At the time of the obligation contracted by Martínez with the Bank, Article 1308 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3661, provided in part that:[8]

> The conjugal partnership shall be liable for:
>
> 1. All the debts and obligations contracted during the marriage by the husband, and also for those contracted by the wife in the cases in which she can legally bind the partnership.

 All debts contracted by Martínez during his marriage to Amieiro were chargeable to the conjugal partnership, whether or not Amieiro had acquiesced to the same. *Truyol v. Registrar*, 18 P.R.R. 901 (1912); *Vivaldi v. Mariani*, 10 P.R.R. 420 (1906). The amendment to the Civil Code approved in 1976 did not alter the

---

**8.** Act No. 51 of 1976 amended articles 91, 93, 1308 and 1313 of the Civil Code generally to make both husband and wife co-administrators of the conjugal partnership and to give the wife the same participation in the affairs of the conjugal partnership. The part of Article 1308 cited herein was amended to read as follows:

> Chargeable to the community property shall be:
>
> 1. All debts and obligations contracted during the marriage by either of the spouses.

prevailing legal situation as of the date which permitted the husband to obligate the conjugal partnership. The matter was not long ago reaffirmed by the Supreme Court of Puerto Rico in *Banco de Ahorro del Oeste v. Santos,* 113 D.P.R. 70 (1982), where the court distinguished between obligational acts and dispositive acts, the latter of which require the concurrence of both spouses. *Id.,* at 74.

 Amieiro's argument for disclaiming liability on the notes is based almost exclusively on the premise that her liability, if any, arises from a certain guarantee executed by her. Such contention cannot be sustained. Amieiro's liability is dependent not on the guarantee but on the fact that she was married to Martínez at the time of the loans. The conjugal partnership established by both was liable to the Bank for the loans taken by Martínez. *Banco de Ahorro del Oeste v. Santos,* 112 D.P.R. 70; *see also, Asociación de Propietarios v. Santa Bárbara Co.,* 112 D.P.R. 33, 49 (1982). Amieiro did not establish any of the exceptions to the general rule imposing liability on the conjugal partnership for the loans contracted by one of the spouses.

The effect of the presumption established by Article 1308 of the Civil Code of Puerto Rico, as interpreted in *Banco de Ahorro,* must be determined in accordance with state law. Fed.R.Evid. 302. The party who seeks to rebut the presumption must present evidence showing the non-existence of the presumed fact. Rule 14 of the Rules of Evidence of Puerto Rico, 32 L.P.R.A.App. IV R. 14. Defendants did not meet their burden. Furthermore, it has never been contended that the loans to Martínez were within the exceptions which release the conjugal partnership from liability on loans contracted by one of the spouses.

 As to Amieiro's personal liability, the same arises from her failure to comply with the express provisions of the Civil Code of Puerto Rico relative to the dissolution and liquidation of the conjugal partnership by divorce. The real properties owned by Martínez and Amieiro were located in Puerto Rico and as such were subject to the law of Puerto Rico which considers all property acquired during marriage as property of the conjugal partnership. Articles 10 and 1307 of the Civil Code of Puerto Rico, 31 L.P.R.A. §§ 10, 3647. Said presumption subsists until overcome by contrary evidence. *People v. Denis Rivera,* 98 P.R.R. 691, 701 (1970); *Robles Ostolaza v. U.P.R.,* 96 P.R.R. 570, 575 (1968). The presumption of community property is not at issue in this case and application of the laws governing the distribution of the community property to the division and distribution of the properties acquired by Martínez and Amieiro during their marriage is critical to the assessment of the liability of Amieiro.

Article 1319 of the Civil Code, 31 L.P.R.A. § 3694, expressly provides that distribution to the former spouses shall be made only "[a]fter the debts, charges, and obligations of the partnership have been paid." Until the partnership is liquidated, the existence of a surplus payable to the former spouses cannot be determined. *Succession of Morales v. Kieckoefer,* 17 P.R.R. 889, 893 (1911). The remainder of the assets, if any, may be divided between the former spouses only after payment of all debts. *Vivaldi v. Mariani,* 10 P.R.R. 420 (1906).

 The division of the assets of the conjugal partnership made by Martínez and Amieiro on January 28, 1977, did not have any binding effect on the creditors. Neither spouse can acquire any rights to a determined portion of the conjugal property until after the liquidation of the partnership, *Escalera v. Falú,* 19 P.R.R. 716, 719 (1913), which liquidation requires prior payment of all the debts, charges and obligations contracted by the spouses during the marriage. Article 1319 of the Civil Code, 31 L.P.R.A. § 3694. The acquisition by Amieiro of a certain undivided interest in the partnership property was made subject to liquidation and did not give her any more rights than she would have had after the liquidation of the partnership. *Vega v. Tossas,* 70 P.R.R. 368, 372 (1949).

■ The former spouses are not free to decide to whom the properties belong since such determination is subject to the liquidation of the partnership in accordance with the rules prescribed by law. *Acevedo v. The Registrar of Caguas*, 23 P.R.R. 267, 268 (1915). In *Janer Vilá v. Superior Court*, 90 P.R.R. 277 (1964), the Court summarized said rules as follows:

As may be seen, the liquidation of the conjugal partnership implies the following operations: 1–inventory; 2–assessment—appraisal according to § 1324 which orders the reference to the rules of benefit of inventory of the inheritance; 3–liquidation, and 4–division and adjudication: II–I Puig Peña, Tratado de Derecho Civil Español 339–344 (Revista de Derecho Privado, 1953 ed.).

*Id.*, 297.

The above procedure was not followed by Amieiro and Martínez. Furthermore, Martínez and Amieiro were required by law to give notice to all creditors if they wanted to take their share of the community property subject to the benefit of inventory in order to continue the administration of the estate until all creditors were paid and to render an accounting of the administration in the event that the estate was not sufficient to pay the debts. *Janer Vilá v. Superior Court*, 90 P.R.R. at 296–297. Neither of these requisites was complied with.

The rules regarding the inventory, the appraisal and sale of the property, and other matters not expressly provided for by the chapter of the Civil Code dealing with the liquidation of the conjugal partnership, are governed by Articles 964 to 988 of the Code relative to the benefit of inventory and right to deliberate in the case of inheritance. Article 1324 of the Civil Code, 31 L.P.R.A. § 3699. Article 972, pertinent here, creates a presumption that the inheritance has been accepted purely and simply "[i]f by the fault or negligence of the heir the inventory is not begun or finished within the periods, and with the formalities prescribed" by law. 31 L.P.R.A. § 2809. At the time of trial, Martínez and Amieiro had been divorced for over six years, no evidence having been presented or adduced

that a request for the benefit of inventory had been made within the time fixed by Article 968 of the Civil Code, 31 L.P.R.A. § 2805, applicable herein by virtue of Article 1324. Amieiro cannot now evade the consequence of her failure to request the benefits of inventory:

Through an acceptance, pure and simple, or without benefit of inventory, the heir shall be liable for the charges on the estate, not only with the property of the same, but also with his own.

Article 957 of the Civil Code, 31 L.P.R.A. § 2785.

■ The conclusion is clear: Amieiro is liable for the obligations of the conjugal partnership established by her and Martínez, not only with the property of the partnership but also with her own.

### F. *Liability of Vilmasor and Lumaral*

The FDIC seeks to impose liability on Vilmasor and Lumaral for the debts of Martínez and Amieiro arguing that the corporations are the alter ego of the defendants. Whether the courts will disregard the corporate entity to impose liability on the corporation for the obligations of its stockholders depends upon the particular facts in each case. "In ascertaining whether the separate corporate entity should be disregarded, each case is *sui generis* and must be decided in accordance with its own underlying facts." *Lettinga v. Agristor Credit Corp.*, 686 F.2d 442, 446 (6th Cir. 1982).

In reviewing this case, we find that Vilmasor and Lumaral are liable to the FDIC on various theories of law. We consider first the doctrine of piercing the corporate veil which disregards the fiction of corporate entity and limited responsibility. Second, the FDIC must prevail in its contention that the transfers of properties made to Vilmasor and Lumaral by Martínez and Amieiro were in fraud of creditors. Each ground is discussed separately.

### 1. *Piercing the corporate veil*

The imposition of liability on a principal for the debts of the corporation has been summed up by attractive metaphors like

"piercing the corporate veil" and "holding a corporation liable for the acts of its alter ego." These gnomic phrases are used interchangeably, although literally they suggest different concepts. Moreover, they describe results, but not the reasoning that leads to those results; they tell us nothing about the basis for imposition of liability. The use of such phrases as a basis for decision occasioned Cardozo's famous warning: "Metaphors in law are to be narrowly watched, for starting as devices to liberate thought, they end often by enslaving it."

*Berkey v. Third Ave. Ry.*, 244 N.Y. 84, 94, 155 N.E. 58, 61 (1926).

Article 101 of the General Corporation Law of Puerto Rico provides that a corporation may be established "for the transaction of any lawful business, or to promote or conduct any legitimate objects or purposes under the provisions of and subject to the requirements" of said law. 14 L.P. R.A. § 1101. The corporation is clothed with legal personality distinct from its shareholders. *Heirs of Santaella v. Sec. of the Treasury*, 96 P.R.R. 431, 439 (1968); *Fleming v. Toal Alta Develop. Corp.*, 96 P.R.R. 234, 237 (1968); *Cruz v. Ramírez*, 75 P.R.R. 889, 895 (1954); N.D. Lattin, The Law of Corporations § 11 (2nd ed. 1971). The courts of Puerto Rico, however, have not refrained from disregarding the corporate entity to prevent an injustice or a wrong. In the leading case of *Cruz v. Ramírez*, the Supreme Court of Puerto Rico in unmistakably clear language said the following:

> We are aware that a corporation has a legal personality independent of its stockholders. But, if the corporation is the mere "alter ego" or business conduit of its only stockholders, with the benefits produced by the corporate business accruing exclusively and personally to them, then the stockholders shall be personally liable if it is necessary to prevent fraud or the accomplishment of an illicit purpose, or to prevent an injustice or a wrong.

75 P.R.R. at 895.

The Supreme Court of Puerto Rico has likewise held that piercing the corporate veil is also justified when the corporate existence is used to "defeat the public convenience, justify wrong, protect fraud or defend crime." *South P.R. Sugar Corp. v. Sugar Board*, 88 P.R.R. 42, 55 (1963).

Resolution of this case, however, does not depend on the law of Puerto Rico. "This action is not a diversity-of-citizenship suit, so that Puerto Rico law does not perforce apply...." *FDIC v. Tito Castro Const.*, 548 F.Supp. at 1225. There are also federal common law precedents on piercing the corporate veil which provide a similarly appropriate rule of decision.

■ Although the circumstances under which a court should disregard the corporate fiction are not always clear and it is difficult, if not impossible, to formulate a precise and categorical definition applicable to all situations, *Brunswick Corp. v. Waxman*, 459 F.Supp. 1222, 1229 (E.D.N.Y. 1978), *aff'd*, 599 F.2d 34 (2nd Cir.1979), the rule in this circuit was succintly stated in *Town of Brookline v. Gorsuch*, 667 F.2d 215 (1st Cir.1981), *quoting, Capital Telephone Co. v. F.C.C.*, 498 F.2d 734 (D.C.Cir. 1974), as follows:

> The general rule adopted in the federal cases is that "a corporate entity may be disregarded in the interests of public convenience, fairness and equity".

667 F.2d at 221. In *Ramírez v. United States*, 514 F.Supp. 759 (D.P.R.1981), a case presenting this issue, this court said that:

> [a]s a general rule it may be stated that a corporation will be looked upon as a legal entity until reason to the contrary appears, but when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud or defend crime the law will regard the corporation as an association of persons.

*Id.*, at 763–64. The formulations of the rule are expressed in various forms. The corporate existence will be disregarded when the corporation is an "instrumentality" or "adjunct" of the parent, *In re Cty. Green Ltd. Partnership*, 438 F.Supp. 701, 705 (N.D.Va.1977), *rev. on other grounds*, 604 F.2d 289 (4th Cir.1979); or is merely an

"agency" or "alter ego" of the parent or individual, *Baker v. Raymond Intern., Inc.*, 656 F.2d at 180; *Loving Saviour Church v. United States*, 556 F.Supp. 688, 691–692 (D.S.D.1983), *aff'd*, 728 F.2d 1085 (8th Cir.1984), or generally when required in the interest of justice, *Matter of Bowen Transports, Inc.*, 551 F.2d 171, 179 (7th Cir.1977); *Milgo Electronic Corp. v. United Business Communications, Inc.*, 623 F.2d 645, 662–663 (10th Cir.), *cert. denied*, 449 U.S. 1066, 101 S.Ct. 794, 66 L.Ed.2d 611 (1980); *Kapp v. Naturelle, Inc.*, 611 F.2d 703, 709 (8th Cir.1979); *Lattin, supra*, § 14 at 72; 1 W. Fletcher, Cyclopedia of the Law of Private Corporations §§ 41–41.10 (rev. perm. ed. 1983). The specific factors to be considered to determine whether the corporate existence is to be disregarded are also numerous.

> The test to be applied is one of honesty and justice, *N.L.R.B. v. Deena Artware, Inc.*, 361 U.S. 398, 80 S.Ct. 441, 4 L.Ed.2d 400 (1960). Among the circumstances to be considered as guidelines are: the extent to which the financial affairs and accounts of a corporation and those who control it are confused to the prejudice of creditors, the undue diversion of funds to individual use, the evasion of contracts or statutes and the abuse of control.

*Ramirez v. United States*, 514 F.Supp. at 764.

Although the usual situation is for a creditor to attempt to pierce a corporate veil in order to impose liability on the shareholders, the corporate veil may also be pierced "in reverse", that is, to impose liability on the corporation for the obligations of its shareholders. *Hudson v. Wylie*, 242 F.2d 435, 441–442 (9th Cir.1957); Fletcher, *supra*, § 41.70 at 458. In *Towers v. Titus*, 5 B.R. 786 (N.D.Cal.1979), the two modalities of piercing the corporate veil were clearly described:

> Finally, it is undisputed that the *alter ego* doctrine is equitable. (Citations omitted.) And despite defendants' protestations to the contrary, the doctrine may be used both in its classic sense, to pierce the corporate veil to impress the debts of a corporation upon an individual, or in a "reverse" sense, to disregard the corporate form to reach the assets of a corporation for the debts of an individual. (Citations omitted.)

*Id.*, at 795.

In the case at bar, the evidence presented at trial reveals that Vilmasor and Lumaral were the alter ego of the defendants, particularly Amieiro, and operated as her personal business conduit. This is shown by the following.

Vilmasor was organized in 1976, at the time when Martínez and Amieiro were heavily indebted to the Bank. Both corporations have been and are dominated by Amieiro, her daughter and her son-in-law. Amieiro and Martínez transferred to Vilmasor all their real property. Amieiro lived in one of the properties owned by Lumaral without paying rent, and when the corporation sold that property, Amieiro bought an apartment in her own name, using the proceeds of the sale of the property by Lumaral. Vilma and Sesto live in a house owned by Vilmasor and pay absolutely no rent, and the corporation has assumed payment of the maintenance and improvements made by Vilma and Sesto to the property. The only business of Vilmasor is the rental of the properties transferred to it by the defendants. Lumaral has no business and does not even maintain a bank account. It is important to note that Amieiro had received all the shares of Vilmasor and Lumaral as part of the settlement agreement with Martínez after their divorce in early 1977 because, in the words of her accountant, Luis E. Cintrón, she wanted to keep control of the real property. The prior transfer of the properties to Vilmasor, however, permitted her to keep control and make use of the properties in a manner that could prevent her creditors from proceeding against the properties. Defendants have diverted more than 100% of the earnings of the corporations for their own personal use. All these circumstances considered, it is clear that Vilmasor and Lumaral are mere instrumentalities of the defendants which have been used to hinder, delay and defraud the creditors of Martínez and Amieiro. The defendants, and particularly Amieiro, have disregarded the corpo-

rate entities and used the corporate shell as a subterfuge to shield assets from creditors. The substantial withdrawals of corporate funds for the personal use of Amieiro and her immediate family clearly demonstrates that the affairs of Vilmasor and Lumaral are "so closely assimilated" to her affairs that in substance the corporations are "little more than [her] corporate pocket". *Sampsell v. Imperial Paper & Color Corporation*, 313 U.S. 215, 218, 61 S.Ct. 904, 907, 85 L.Ed.2d 1293 (1941).[9] The complete domination and control of the corporations by Amieiro and her immediate family cannot be questioned.

In view of the above, the Court believes that the equitable doctrine of piercing the corporate veil should be applied here. Otherwise, manifest injustice would result from treating Vilmasor and Lumaral as separate entities when in fact they have merely been personal business conduits of the defendant used and designed for the only purpose of hindering, defrauding and delaying the creditors of Martínez and Amieiro.

### 2. The fraudulent conveyance of properties by Martínez and Vilmasor

Article 1227 of the Civil Code of Puerto Rico provides as follows:

Contracts without consideration or with an illicit one have no effect whatsoever. A consideration is illicit when it is contrary to law and good morals.

31 L.P.R.A. § 3432.

The deed by which Martínez and Amieiro transferred their real properties to Vilmasor on December 16, 1976, states that the consideration for transfer was the issuance to Martínez and Amieiro of 1,440 preferred shares of Vilmasor of an aggregate value of $144,000 although the properties were valued at $579,000 in the same deed. The remaining $435,000 was to be retained by Vilmasor to pay the mortgages securing payment of certain bearer notes executed by Martínez and Amieiro in May of 1975. At the time of the transfer of the proper-

ties the notes were in possession of Martínez and Amieiro.

■ The said transfer to Vilmasor was effected for considerations, the value of which was substantially less than the true value of the properties at the time of the transfer. First, the properties were grossly undervalued in the deed of conveyance. This is apparent from the personal financial statement as of January 31, 1976, of Martínez and Amieiro prepared by their accountant and submitted as Exhibit O of the defendants. In spite of the fact that the properties had been valued at $776,500 in that report, which amount constituted 92% of the total estimated value of the real property owned by Martínez and Amieiro, the value assigned to these same properties in the deed of conveyance to Vilmasor eleven months later was $579,000, that is, $187,000 or 24% less than the previously stated value.

Second, the mortgages in the amount of $435,000 that Vilmasor would pay as part of the consideration lacked any effectiveness since the notes, the payment of which was secured by the mortgages, had never been negotiated by Martínez and Amieiro and therefore did not represent any valid obligation. *S.J. Credit, Inc. v. Ramírez*, 113 D.P.R. 181, 185 (1982); *Liechty v. Descartes Saurí*, 109 D.P.R. 496, 498 (1980). Attention is called to the division of assets of the conjugal partnership made by Martínez and Amieiro on January 28, 1977, only one month after the transfer of properties to Vilmasor, which expressly assigned to Amieiro all the rights, titles and interest of the conjugal partnership in the bearer notes secured by the mortgages encumbering the properties transferred by Martínez and Amieiro to Vilmasor. (Exhs. 25, F). In order for the notes to evidence an obligation they must have been negotiated:

It is true that the mortgage deed to guarantee a promissory note to bearer is not a bilateral contract at the time when it is made, nor can it be so considered until the promissory note is negotiated

9. It has not escaped attention that all payments to the defendants are made in such form as to avoid the requirement of withholding of income tax.

by the debtor, by its delivery to the person who in turn will deliver the amounts of the loan.

*Morales v. Registrar,* 54 P.R.R. 520, 521–522 (1939).

Since the mortgages did not guarantee any valid obligation, Vilmasor assumed none. The statement that Vilmasor would retain the amount of the mortgages to pay them as they became due lacked any effectiveness because no obligation existed. *Liechty v. Descartes Saurí* is applicable here by analogy:

> There existed no obligation to be guaranteed because the Descartes Saurí spouses did not negotiate the mortgage notes nor ceased to be their owners.... The mortgage created to guarantee said notes never had any legal life because it never came to guarantee any obligation whatsoever.

109 D.P.R. at 502. (Translation ours.)

The only consideration, therefore, received by Martínez and Amieiro was the 1,440 shares of capital stock of Vilmasor, the par value of which represented only 19% of the total value of the properties transferred to Vilmasor.

■ The conclusion that the transfer of properties to Vilmasor was made in fraud of creditors is not based only on the inadequacy of the consideration received. The circumstances of the transfer point to a pattern designed to hinder, defraud and delay the creditors of Martínez and Amieiro. The transfer of the properties to Vilmasor at a time when Martínez and Amieiro remained heavily indebted to the Bank permitted them to place their major assets out of the reach of their creditors since the shares of Banco de Economías that secured payment of the obligation to the Bank had suffered great depreciation in value. The fact that the transferee was controlled by the defendants is "a suspicious circumstance which together with others may be considered to show the existence of fraud...." *Nine v. Avilés,* 53 P.R.R. 471, 476 (1938); *Texas Co. (P.R.), Inc. v. Estrada,* 50 P.R.R. 709, 717 (1936). Here Amieiro has remained in control of the properties, and has continued to receive the income derived from the rental of the properties, in spite of the transfer.

The assignment of the secured notes to Lumaral was also in fraud of creditors. The minutes of the meeting of directors of Lumaral which recorded this transaction state that the indebtedness. of Amieiro to Lumaral on February 15, 1980, was $326,569.47. (Exh. 61). That is the same amount shown for notes receivable due from stockholders in the financial statements of Lumaral as of January 31, 1977 (Exh. 49), and in the books of Lumaral for notes receivable due from Amieiro on February 1, 1977 (Exh. 67). On January 28, 1977, Martínez and Amieiro had executed the instrument by which they purportedly divided the property of the conjugal partnership, and which provided that Martínez assumed all of the liabilities of the conjugal partnership. (Exh. F). If, as Amieiro contends, that instrument was valid and effective, then she could not have believed that she was indebted to Lumaral when the secured notes were assigned. If, on the other hand, she knowingly engaged in a transaction in fraud of creditors, her knowledge of the nature of the transaction is imputable to Lumaral since she was a shareholder, director and officer of the corporation.

■ In attacking a transaction which tends to create an apparent insolvency of the debtor, the creditor is not limited to the express conditions which give rise to a presumption of fraud under Article 1249 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3498. That article does not prevent the use of other probative means to establish the existence of the fraud. The two presumptions established by the Code do not exhaust the possible cases of fraud. The trier of the fact exercising judgment free of the legal presumptions should weigh the most obvious signs of fraud, such as the haste with which the alienation is effected, the insolvency of the debtor, the relations of family, intimacy or confidence with the acquirer, the state of the business affairs of the transferor and judicial claims pending against him. *De Jesús v. Carrero,* 112 D.P.R. 631, 636–37 (1982).

■ Application of these factors to the facts of this case reinforces the conclusion that the transactions were in fraud of creditors. The transactions which tended to place the assets of Martínez and Amieiro beyond the reach of creditors were recorded with dates in February 1980. The phraseology is intentional since as previously noted there are two sets of minutes recording the same transactions but dated two years apart. On February 15, 1980 (or 1982), the minutes of Vilmasor report a gift of 150 preferred shares of the par value of $100 per share to each of her granddaughters, Vilma and Soraya Sesto Martínez. (Exhs. 69 and 68). The same minutes report the assignment to Lumaral of the notes secured by mortgages on the properties transferred to Vilmasor. The same minutes authorize the issuance of 50 common shares of the par value of $100 per share to Vilma "for services rendered." The minutes of a meeting of directors of Lumaral with the same date, February 15, 1980, record the assignment of the secured notes to Lumaral. Surprisingly the minutes of Vilmasor do not reflect the transfer to that corporation of the preferred shares held by Amieiro in satisfaction of her indebtedness, also purportedly on February 15, 1980. That transaction was recorded by a journal entry bearing the same date. (Exh. K). At the close of the preceding fiscal year, January 31, 1980, the financial statements of Vilmasor reflected a deficit. (Exh. G). These transactions, all occurring in the space of a month, give the impression of haste. After these transactions Martínez and Amieiro were apparently insolvent. The transactions were effected with corporations controlled by Amieiro and her immediate family. Amieiro had no other business affairs. Whether this judicial claim was actually pending at the time of the transactions depends upon the actual date on which they were effected. Considering all these factors the conclusion is inescapable that it was the intention of these transactions to hinder, delay and defraud creditors and that the objective was realized up to the present time.

■ The law of Puerto Rico also regulates the manner in which creditors are paid. 31 LP.R.A. §§ 5191–95. Creditors who do not enjoy priority expressly provided have no preference in the order of payment pursuant to § 5195 and are the last to be paid. 31 L.P.R.A. § 5214.[10] The common creditors having no priority are to be paid pro rata. 12 J.M. Manresa y Navarro, Comentarios Al Código Civil Español, 997 (6th ed. 1973), rev. by J.J. Gómez Ysabel. Amieiro's payment of the indebtedness to Vilmasor in preference over other creditors such as the FDIC also violated the cited provisions of the Civil Code of Puerto Rico.

■ Transactions in fraud of creditors may be rescinded. 31 L.P.R.A. § 3492. So too many payments by an insolvent debtor. 31 L.P.R.A. § 3493. Any person who has acquired in bad faith things alienated in fraud of creditors is liable for the damages caused whenever it is impossible to return the things so acquired. 31 L.P.R.A. § 3499. Both Vilmasor and Lumaral, the acquirers here, must be charged with the knowledge of Amieiro and Vilma, who as directors and officers of the corporation appear as authorizing the various transactions. Vilmasor and Lumaral are liable to the FDIC for the return of the real and personal properties acquired from Amieiro or for the damages caused by the transactions in fraud of creditors.

In the *foregoing* discussion of the liability of Vilmasor and Lumaral reliance has been placed on the law of Puerto Rico. However, as noted above, the rights of the FDIC must be determined by reference to federal law. State law may be utilized as the rule of decision where national uniformity is not required. With respect to the defense of fraud raised against the FDIC, in its corporate capacity, a uniform rule has been adopted. *Southern Industrial Realty, Inc. v. Noe, supra; Gunter v. Hutcheson,* 674 F.2d 862 (11th Cir.), *cert.*

10. Of course, the filing of a petition under the Bankruptcy Code, 11 U.S.C. §§ 1–1330, provides other priorities which may supersede state law.

*denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982); *Gilman v. Federal Deposit Insurance Corp.,* 660 F.2d 688 (6th Cir.1981). The rule is otherwise when the FDIC acts in its capacity of receiver of a closed bank. *Federal Deposit Insurance Corp. v. Palermo,* 815 F.2d 1329 (10th Cir. 1987).

■ The issue here is whether a uniform rule is required when the FDIC bases its claim on fraud. It would be presumptuous of this Court to attempt to fashion a uniform rule applicable to the myriad modalities of fraud which might give rise to such a claim. It suffices for purposes of this case to point out that the result does not vary whether a general principle of law on which a federal rule might be based is applied, or whether state law is used as the basis of decision. The result would be the same in either case. The specific sections of state law applicable to an action of this nature in Puerto Rico are identified and discussed above. In addition, the law of Puerto Rico includes a general provision for actions based on fault or negligence. 31 L.P.R.A. § 5141. The concept of "fault" is broad, including acts committed knowingly and willfully, such as those which are unlawful, fraudulent or deceitful. *Reyes v. Heirs of Sánchez Soto,* 98 PR.R. 299 (1970). This principle is essentially the same as the general doctrine applicable to tortious conduct involving harm intentionally inflicted set out in Restatement (Second) of Torts § 870 (1977). The specific provisions of state law relating to transfers in fraud of creditors give clearer guidance in resolving the issues presented by this case. Whether applied directly or whether utilized as persuasive analogy in applying the general principle of liability for fault or intentional conduct, the conclusion remains the same—Vilmasor and Lumaral are liable to the FDIC.

### G. *Liability of Vilma and Sesto*

What has been said with respect to the defendant corporations applies to Vilma and Sesto but with an exception. Neither Vilma nor Sesto is an acquirer of properties transferred by Martínez and Amieiro although they indirectly benefit from said transfers. Therefore, their liability must be determined without reference to Article 1250 of the Civil Code of Puerto Rico, 31 L.P.R.A. § 3499.

The right of the United States to recover pecuniary loss resulting from fraudulent acts was recognized in this circuit many years ago. *Pooler v. United States,* 127 F. 519 (1st Cir.1904). That right existed at common law and was not created by statute. *Id.* at 520. Exercise of the right by an agency of the United States has been sustained. *Mt. Vernon Cooperative Bank v. Gleason,* 367 F.2d 289 (1st Cir.1966).

■ The transactions in which Vilma and Sesto participated, or in which Sesto at least knowingly acquiesced as a director and officer of Vilmasor and Lumaral, had the objective and did cause damage to the FDIC. Vilma and Sesto are liable to those damages.

### H. *Liability of Vilma and Soraya Sesto*

■ The donation by Amieiro on or about February 1, 1980, of 300 of her shares of preferred stock of Vilmasor to her granddaughters, Vilma and Soraya Sesto, is subject to the presumption of Article 1249 of the Civil Code of Puerto Rico, which presumes said donation to have been executed in fraud of creditors. The presumption was not rebutted by the defendants. The transfer by Amieiro to her granddaughters of the 300 shares of Vilmasor had no legal effect whatsoever. Article 1227 of the Civil Code, 31 L.P.R.A. § 3432. Accordingly, the transfer may be rescinded:

*Contracts subject to rescission*

The following may be rescinded:

\*　　\*　　\*　　\*　　\*　　\*

3. Those executed in fraud of creditors, when the latter cannot recover, in any other manner, what is due them.

\*　　\*　　\*　　\*　　\*　　\*

Article 1243 of the Civil Code, 31 L.P.R.A. § 3492.

Since no evidence has been presented to permit extending the liability of the minor defendants beyond that imposed by the above cited article, the relief against the

latter will be limited to rescind the transfer of shares to them made by Amieiro.

### The Relief

On the basis of the foregoing findings and conclusions,

IT IS HEREBY ORDERED that the FDIC is entitled to a judgment granting the following relief:

a) decreeing that the FDIC have and recover of defendants Isabel Amieiro, Vilma Martínez Amieiro, Jorge Sesto, Inversiones Vilmasor, Inc., and Lumaral Corp., *in solido,* all amounts payable to the FDIC on the claims against Luis Martínez Almodóvar and Isabel Aimieiro; and

b) decreeing the rescission of the transfer effected on or about February 1, 1980, by defendant Isabel Amieiro of 300 shares of preferred stock of Inversiones Vilmasor, Inc., to Vilma and Soraya Sesto Martínez; and

c) decreeing the rescission of the transfer effected on or about February 15, 1980, by defendant Isabel Amieiro of 1,140 shares of preferred stock of Inversiones Vilmasor, Inc., to that corporation; and

d) decreeing the rescission of the transfer effected on or about February 15, 1980, by defendant Isabel Amieiro of notes payable to bearer in the principal amount of $370,000, secured by mortgages on the properties transferred to Inversiones Vilmasor, Inc.; and

e) awarding to the FDIC the costs of this action and a sum as attorneys' fees.

In view of the time that has elapsed, the FDIC is granted a term of ten (10) days from the date of entry of this order for the submission of affidavits as to the amount presently due on the notes which are the object of this action and the services rendered by the attorneys representing the FDIC in this action, and the value of said services. A supplementary order for judgment will be entered thereafter.

IT IS SO ORDERED.